## Case No. 17,731.

### WILLIAMS v. NEW ENGLAND INS. CO.

[3 Cliff. 244.][1]

Circuit Court, D. Massachusetts. May Term, 1869.

MARINE INSURANCE—CHARTER BY GOVERNMENT—LOSS BY CHARTERER'S FAULT.

1. The defendant insured a vessel lost or not lost for the term of one year, taking the risk at sea, and in port, in dock, and on ways, with permission to sail with or without pilots, and to tow and assist vessels in all situations. Liability not to attach for any breakage of machinery or bursting of boiler unless caused by stranding or collision. The underwriters were to be liable if the vessel should take fire, and any part of the machinery or boilers was thereby damaged. When insured, the vessel was laid up. After insurance she was chartered to the United States government to be used as a government transport, but not to go to any place where there was not sufficient depth of water for her to go in safety. She was sent by a military officer of the United States to Hatteras Inlet. When starting for that place her destination was not known to her owner, but was to the charterers and their agents, as was also the fact that she was to cross the bar at the inlet. She proceeded to her destination, and remained outside the bar until ordered from a government tug to follow the tug over the bar. In following the order she struck on the bar, was driven among the breakers and became a complete wreck. The order to cross the bar was from the military commander of the expedition acting under the authority of the government of the United States. The draught of the vessel and the depth of water on the bar were known to the master of the tug. The water was so shoal that a vessel of the size, draught, and build of the insured one could not reasonably be expected to

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

cross in safety, and such striking would naturally result in her loss. There was a strong wind and a high sea. The attempt to cross the bar was rash, hazardous, and unjustifiable. Held, the orders of the general commanding must be considered as if given by the president. But the United States were the charterers, and must be regarded as the agents of the owners, and the question was the same as if the owners themselves had given the order to cross the bar, instead of a military commander in the United States army, and the same consequences ensued, and that the plaintiff could not recover.

2. Insurance money may be recovered where losses were remotely occasioned by the negligence or misconduct of the master of the vessel, if proximately caused by the perils insured against.

3. But the insured cannot recover for a loss occasioned by his own wrongful act, or by that of any agent for whose conduct he is responsible.

Agreed statement. Assumpsit upon a marine policy of insurance. The principal question was, whether the circumstances attending the loss were such that the plaintiff [William P. Williams], within the true intent and meaning of the policy, was entitled to recover. Briefly stated, the material facts were: That the plaintiff was owner of the steamship New York, her furniture, engine, machinery, and boiler; and that the corporation defendants on May 4, 1861, insured the same, lost or not lost, in the sum of $6,500 for the term of one year from that date; taking the risk at sea and in port, in dock and on ways, with permission to sail with or without pilots, and to tow and assist vessels in all situations. . . . . Liability not to attach "for any derangement or breakage of machinery or bursting of boilers unless occasioned by stranding or collision with another vessel." The company was to be liable if the vessel should take fire, and any part of the machinery, or the boilers, should thereby be damaged. The value of the steamship and her furniture expressed in the policy was $18,000, and the sum insured on the same was $3,900. The policy value of the engine, machinery, and boilers was $12,000, and the sum insured on the same was $2,600, at a premium of twelve per cent. Two other policies of like date, tenor, and effect were also obtained by the plaintiff in two other companies upon the same steamship and her furniture, and also on her engines, machinery, and boilers, amounting in all to the sum of $9,500, in addition to the amount involved in this suit. The agreed statement showed that the same valuation was affixed to the objects insured in those policies as is expressed in the policy in this case. The amount insured in this policy was made payable in case of loss to a third party, but as the claim of that party was paid before the loss, no further reference to that circumstance is necessary. Prior to November 1, 1861, the steamship had always been employed in the merchant service, but at the date of the policy she was laid up in the harbor of Boston, without employment. On November 1, 1861, she was chartered by her owner for the period of fifteen days to the United States

government, by a charter-party of that date, "to be used as a government transport, and to leave New York under sealed instructions, to be opened when one hundred miles south of that port," and to be governed in her future course by such instructions, but not to be compelled to visit any port or place at which there was not sufficient depth of water for her to go in safety. Subsequent to the expiration of that charter-party, to wit, on December 27th, in the same year, the owner of the steamship, in consideration of $300 per day, during the term of the contract, and until she should be returned to her owner at that port, chartered her to the transport agent of the war department for the full term of ten days from the date of the charter, and as much longer as she should be required by the war department, subject to all the conditions specified in the antecedent charter to the United States government. Under the last-named charter-party the steamship was immediately taken into the possession and control of the United States, and was sent to a dock in that port for repairs. When repaired she was loaded by the charterers with ordnance stores, and on January 7th following, she sailed under orders communicated to her master to proceed to Fortress Monroe for further orders from the government. Pursuant to those orders she proceeded to the anchorage off that fortress, and there the master, on January 7th, received sealed orders from General A. E. Burnside, subsequently opened at sea, "to proceed directly to Hatteras Inlet, hoist your signal for a pilot, and after crossing the bar, anchor as far on one side of the channel as you can with safety." In obedience to that order the steamship at 12 m., on January 13th, came to anchor in safety off Hatteras Inlet, and set her signal for a pilot. Remark should be made that when she sailed for Fortress Monroe her ultimate destination was not known to her owner, but the charterers and their agents who had charge of her, and of her loading, knew that she was destined to proceed to Hatteras Inlet and across the bar there for the purpose of transporting ordnance stores for the troops of the United States as one of the fleet of the Burnside expedition. The agreed statement also showed that the steam-tug Ceres, then in the employment of the government as a pilot for that expedition, came out at three o'clock in the afternoon of that day and gave orders to the steamship to follow her over the bar, and it was agreed that in attempting to do so, and when she was directly in the wake of the pilot-boat, and within a ship's length of her, she struck upon the bar, where she remained fast, but before the following morning she was driven upon the breakers, and during the next day and night became, by force of the wind and waves, a complete wreck, and was totally lost and destroyed.

C. T. & T. H. Russell, for plaintiff.
W. G. Russell, for defendants.

Before CLIFFORD, Circuit Justice, and LOWELL, District Judge.

CLIFFORD, Circuit Justice. Three principal defences are set up by the defendants to the claim of the plaintiff, but they will be considered in the reverse order from that in which they were presented at the argument. They contend that the plaintiff cannot recover, for the following reasons:

1. Because the ship was lost, not by perils insured against, but by the wrongful act of the insured, or his agents.

2. Because the employment of the steamship in the military service was such a change of risk contemplated by the parties, as to discharge the underwriters from their liability.

3. Because the steamship, when she sailed, was unseaworthy for the intended voyage and was lost by reason of such unseaworthiness.

Marine insurance is a contract whereby one party for a stipulated sum undertakes to indemnify the other for loss arising from certain perils or sea-risks to which ship-merchandise or other interest may be exposed, during a certain voyage or for a certain period of time. Seaworthiness of the ship for the voyage when she sails is a condition precedent to the liability of the underwriter for any loss incurred in the course of the voyage. Repairs may be made while the vessel is in port and during the lading of the cargo, as it would occasion much delay and unnecessary expense to require that she should be completely repaired before she can take on board any part of her cargo, and such a rule, if adopted, would be of no benefit to the insurers, provided the vessel is made seaworthy before she sails. Merchants' Ins. Co. v. Clapp, 11 Pick. 56. The meaning of that requirement is, that the vessel shall be staunch and strong, that she shall be suitably furnished, and that she be provided with a competent master and with a crew adequate in number and with sufficient experience for the voyage. The Niagara v. Cordes, 21 How. [62 U. S.] 23. Provided the ship is seaworthy and properly commanded, equipped, and manned when she sailed, as the contract requires, the insurers are liable for any loss proximately caused by the perils insured against, although they have been remotely occasioned by the negligence or misconduct, not amounting to barratry, of the master or crew, whether such negligence or misconduct consisted in omitting some act which ought to be done, or in doing some act which ought not to be done, in the course of the navigation. Redman v. Wilson, 14 Mees. & W. 476; Patapsco Co. v. Coulter, 3 Pet. [28 U. S.] 236; Columbia Ins. Co. v. Lawrence, 10 Pet. [35 U. S.] 517; Waters v. Merchants' Ins. Co., 11 Pet. [36 U. S.] 218; 2 Arn. Ins. 770; 1 Phil. Ins. § 1051.

Underwriters are held to be liable under such circumstances, by the very terms of the policy, as they take upon themselves all losses by the perils therein enumerated without any reference to the fact whether they are at-

tributable to the negligence or default of the master or crew, or to mere accident or irresistible force. Doubtless such an exception might be made, but the law will not make it, where there are no words in the policy to signify that such was the intention of the parties, as the owner is not in general in any better condition to guard against a loss by such means than the insurers. Hale v. Washington Ins. Co. [Case No. 5,916]; Copeland v. New England Marine Ins. Co., 2 Metc. [Mass.] 432. But the insurers are not liable for a loss even by the perils enumerated in the policy, if it was occasioned by the wrongful act of the insured or his agents, for whose conduct he was directly responsible. 1 Phil. Ins. 1046.

Authorities to prove that persons insured cannot recover for a loss occasioned by their own wrongful acts are hardly necessary, as the proposition involves an elementary principle of universal application. Losses may be recovered by the insured, though remotely occasioned by the negligence or misconduct of the master or crew, if proximately caused by the perils insured against, because such mistakes and negligence are incident to navigation and constitute a part of the perils which those who engage in such adventures are obliged to incur, but it was never supposed that the insured could recover indemnity for a loss occasioned by his own wrongful act or by that of any agent for whose conduct he was responsible. Thompson v. Hopper, 6 El. & Bl. 944; Marsh, Ins. 376; American Ins. Co. v. Ogden, 20 Wend. 305; Bell v. Carstairs, 14 East, 374; Cleveland v. Union Ins. Co., 8 Mass. 308.

Attention will next be called to certain other material facts of the case, as agreed by the parties. They agree that the order from the steam-tug to the steamship to cross the bar was given by direct authority from the commander of the expedition, and that the draught of the steamship was known to the master of the tug who gave the order, and that the draught of water upon that bar was a well-known and notorious fact; that the shoalness of the water there is such that a steamship of the draught of the steamship in question could not reasonably be expected at any stage of the tide to cross that bar in safety; that a vessel of the draught and build of the steamship was an unfit vessel for a voyage across that bar, because she would, under the most favorable circumstances, strike upon the bar, and, unless taken in tow by a steamer of lighter draught, such striking would naturally if not inevitably result in her loss; that there was a strong wind and a high sea at the time the attempt to cross the bar was made, increasing both the ordinary liability to strike and the danger resulting from it; and they also agree that taking into consideration the state of the tide, sea, and wind at the time, the attempt to cross the bar was an unjustifiable, rash, and hazardous act of navigation which no prudent or skilful navigator would have undertaken; that the master

would not have made the attempt except from the compulsory order from the steam-tug, but would have remained at anchor in safety where he was when he received the order off Hatteras Inlet. Apart from the other defences, it is quite clear that the facts set forth in the agreed statement applicable to the proposition under consideration show that plaintiff cannot recover.

Obedience to the order from the steam-tug could not be refused, as it emanated from the general commanding the military expedition, who beyond question represented the United States. Orders given by a commanding general under those circumstances must be regarded as of the same effect as if given by the president, as they were not countermanded and have never been disavowed. The Venice, 2 Wall. [69 U. S.] 276. Beyond question the United States were the charterers of the steamship, and as between these parties they must be regarded as the agents of the owners of the steamship. Viewed in that light, the question is, whether the owners, if they had given the order to cross the bar when it was given by the steam-tug, and the steamship had been lost, would have been entitled to recover.