STANDARD MARINE INS. CO., Limited, OF LIVERPOOL, ENGLAND, v. NOME BEACH LIGHTERAGE & TRANSPORTATION CO.

(Circuit Court of Appeals, Ninth Circuit. November 7, 1904.)

No. 979.

1. MARINE INSURANCE—CONSTRUCTIVE TOTAL LOSS—ABANDONMENT.
    In marine insurance, a constructive total loss is one upon the happening of which the insured may abandon the subject-matter of the insurance; and, unless there remains something of value to pass to the underwriter, there is nothing to abandon, and no case for the application of the doctrine of constructive total loss.

2. SAME.
    An insured cargo was damaged to some extent on the voyage from perils of the sea, and after reaching the port of delivery both vessel and cargo

¶ 1. See Insurance, vol. 28, Cent. Dig. §§ 1192, 1195.

were sold in satisfaction of a claim for salvage. There was no evidence to show the amount of the damage to the cargo, nor was the value of the salvage services ever ascertained. There was no abandonment prior to the sale. *Held,* that there could not be an abandonment afterwards, to create a constructive total loss, the property having passed beyond control of the insured; nor were the facts such as to constitute a total loss without abandonment.

3. SALVAGE—AUTHORITY TO DETERMINE RIGHTS—NONJUDICIAL OFFICER.

The captain of a revenue cutter lying at Nome, Alaska, at a time when there was no court at the place, had no authority to determine the rights of salvors, unless as arbitrator by agreement of the parties; the question being a judicial one, of which a court of admiralty alone has jurisdiction.

4. MARINE INSURANCE—SUE AND LABOR CLAUSE—CONTRIBUTION BY INSURER TO EXPENSE.

Under a marine policy requiring the insured to sue, labor, and travel, and use all reasonable means for the security, preservation, and recovery of the property insured, for the expense of which the insurer will contribute in proportion as the sum insured is to the whole sum at risk, the sum at risk is the valuation of the property as stated in the policy, which is conclusive between the parties; and the rule is not changed because such sum happens to equal the sum insured, thus obligating the insurer to pay the whole of the expense incurred under the sue and labor clause.

5. SAME—LOSS THROUGH WILLFUL ACT OF MASTER—CALIFORNIA STATUTE.

Under Civ. Code Cal. § 2629, providing that "an insurer is not liable for a loss caused by the willful act of the insured, but he is not exonerated by the negligence of the insured, or of his agents or others," expressly made a part of a marine policy on cargo, there can be no recovery for loss or damage resulting directly from the act of the master in designedly undertaking to force the vessel through floating ice on a voyage to Alaska, with knowledge of the dangers to be encountered and with ample time to have avoided them, in order to arrive more quickly at his destination and secure a better market for his cargo. Such conduct is not mere negligence, but is a willful omission to perform his legal duty and an intentional commission of a wrongful act.

In Error to the Circuit Court of the United States for the Northern District of California.

For opinion below, see 123 Fed. 820.

Van Ness & Redman, for plaintiff in error.
Nathan H. Frank, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. This writ of error brings up for review a judgment against the Standard Marine Insurance Company, Limited, based upon a policy covering certain articles laden on the barkentine Catherine Sudden for a voyage from the port of San Francisco to Nome, Alaska, whereby the insurance company insured certain merchandise of the defendant in error, laden below deck, in the sum of $5,250, and a lighterage plant, also belonging to the defendant in error, laden on deck, in the sum of $3,000, against—

"Perils of the seas, pirates, assailing thieves, jettisons, barratry of the master or mariners, and all other losses and misfortunes that have or shall come to the hurt, damage, or detriment of the said property, or to which insurers are liable by the rules and customs of insurance in San Francisco, excepting such losses and misfortunes as are excluded by this policy."

The policy provided that the risk thereunder should "cease at ship's tackle or thirty days after arrival at destination"; and, in accepting it, the defendant in error engaged for itself, its factors, servants, and assigns—

"To sue, labor, and travel, and use all reasonable and proper means for the security, preservation, relief, and recovery of the property insured, or any part thereof, and also to use all proper and legal means to recover, through general average or otherwise, from the parties interested in vessel, freight, or cargo, either or all, any sums due the property insured or its owners, on account of sacrifices, losses, or expenses incurred for the general safety or the common good, to the charges whereof this company will contribute in proportion as the sum insured is to the whole sum at risk."

None of the articles in question were covered by the memorandum clause of the policy, which provided that all articles not excepted under that clause were—

"Warranted by the insured free from particular·average and partial loss, unless occasioned by standing, sinking, fire, collision, or other extraordinary peril hereby insured against, and amounting to fifty per cent. or more on the sound value of the whole shipment at the port of delivery, and all such loss shall be settled on the principles of salvage loss, with benefit of salvage to the insurers."

The policy contained the further stipulation—

"That the provisions of the Civil Code of California shall be conclusive and binding, as regarding the warranty of seaworthiness, liability of insurers in case of prior, subsequent, or simultaneous insurance, and such other questions as are therein legislated upon and not otherwise provided for in this policy."

The complaint alleges that while the vessel was proceeding upon her voyage the whole of the insured merchandise and lighterage plant were lost by perils of the sea, to the damage of the defendant in error in the full sum insured.

Among the defenses interposed by the insurance company were the following: That the Sudden, with its cargo, including the articles here involved, sailed from San Francisco for Nome April 28, 1900, and on or about the 28th day of May, 1900, in passing through and out of Unimak Pass into Behring Sea, met drift ice, and within 24 hours thereafter met with large fields of ice; and within 48 hours thereafter ran into and was surrounded with heavy ice, and thereafter, and on or about the 3d day of June, 1900, was struck by ice on her port bow, which was thereby stove in; that by reason of the injury the vessel was so crippled that she was compelled to seek and obtain assistance from other vessels then in the vicinity. That the property insured by the defendant to the action, and then on board the Sudden, consisted of miscellaneous merchandise stowed below deck, and a lighterage plant, consisting of a launch, scow, and surf boat or boats, loaded upon her deck. That in the vicinity of the Sudden at the time were the sailing vessels Pitcairn and Rube Richardson and the steamer Corwin. That considerable portions of the merchandise so insured by the defendant to the action were taken from the Sudden by the Pitcairn, Rube Richardson, and Corwin. That the plaintiff to the action then and there arranged with the captain of the Corwin to tow the Sudden and the launch, scow, and surf boat or boats to Nome,

Alaska, agreeing to pay as salvage for towing the launch, scow, and surf boat or boats the sum of $2,500; and that in pursuance of that agreement the Corwin did tow the launch, scow, and surf boat or boats and the Sudden, with so much of the insured cargo thereon as had not been taken from her by the Corwin, Pitcairn, and Rube Richardson, to Nome. That the plaintiff to the action sailed the Sudden into the ice, knowing full well that so to do endangered the safety of that vessel, and that so to do was not consistent with good seamanship, or with due and proper care; but that plaintiff, when ice was encountered, in the exercise of due and proper care, should have changed the course of the vessel, and have sought open water or a port of safety until the danger from ice had passed. That upon the arrival of the Sudden and the launch, scow, and surf boat or boats at Nome in tow of the Corwin, the launch, scow, and surf boat or boats were delivered to the plaintiff to the action, and upon the suggestion of its agent at Nome a survey was held upon the vessel and cargo, resulting in the condemnation of both vessel and cargo, and a recommendation that they be sold; whereupon the vessel and cargo were sold at public auction. That the sale of the cargo was by manifest lots, without inspection or opportunity to inspect by the purchasers thereof. That at the sale the merchandise here in question was sold for $530, which was at the time of a value greatly in excess of that amount. That with the lighterage plant the insured merchandise could have been landed at Nome. That the plaintiff to the action did not in any way seek to arrange with the Corwin, or with any of its officers, agents, or servants, for the landing or delivery to the plaintiff of the insured merchandise, or any part thereof, nor to secure from the Corwin, or any of its officers, agents, or servants, nor from the Pitcairn or Rube Richardson, the return or delivery to the plaintiff of any of the merchandise taken from the Sudden, nor any compensation therefor, and did not in any way seek, and has not in any way sought, to arrange or agree with the Corwin, or with any of its officers, agents, or servants, for the amount to be allowed or paid to it by way of salvage for the insured merchandise in question, and did not in any way seek, by the purchase of such merchandise at such sale or otherwise, or at all, to recover the insured merchandise, or otherwise to reduce the loss to the plaintiff or to the defendant to the action. That had the plaintiff sought to secure the delivery to it of the insured merchandise, or had bid in the same at the auction sale, it could and would have greatly lessened the loss to plaintiff on such merchandise. That upon the arrival of the Sudden at Nome the weather was calm, and that the insured merchandise could have been safely landed and delivered to the plaintiff, and would have been so delivered if plaintiff had sought to secure the delivery thereof.

It appears from the record that the Sudden left San Francisco in command of Capt. John L. Panno, on the 28th day of April, 1900, and proceeded on her voyage, sailing through the Unimak Pass into Behring Sea about the 1st of June. We extract from the testimony of Capt. Panno:

"We sailed from San Francisco on the 28th day of April. The vessel was not down in the water more than usual. She was properly loaded. As a mariner I considered it a late date to start for Nome Beach. Vessels had gone ahead of us; the Thrasher and the Pitcairn, and several others. I cannot remember the names. Most all the steam vessels had gone ahead of us. The Thrasher was a steamer, and the Pitcairn was a sailing vessel. The Rube Richardson was a sailing vessel. The Pitcairn left some time in January or February. We overtook her on the way up. She had two or three months the start of us. I found her in the ice. The Unimak Pass is located at the entrance to the Behring Sea. We passed through Unimak Pass into Behring Sea. We went through the pass about the 1st of June. We did not come in sight of ice until after we got to Unimak Island. I think that was about two and a half or three days from Unimak Pass. The ice was about five miles away when I first sighted it. It was about 5 o'clock in the afternoon then. It was on the lea beam. It was to the left of us. The ice was in small pieces, as big as this room and bigger. They were floating pieces, broken ice. Some of them were about level with the water, and some of them eight or ten feet high. It is generally understood that the largest part of a chunk of ice is that below the surface of the water. I had no idea how far below it extended. Some of these small chunks that I noticed floating about were a quarter of a mile, a mile, and five miles apart. They were not very numerous. I sailed right on, and did not turn around and go back. My object was to get through it. When I got to the ice itself I found leads once in a while. Perhaps to-night I would be all inclosed with ice—ice all round us, so we could not move any way; but during the night that ice would move, and perhaps in the morning at 8 or 9 o'clock we would have a lead of four or five miles that we could sail through. But around these leads, on each side and forward, it was full of ice. The ice got thicker as I proceeded. I sighted a lot of vessels about the time I first struck this ice in Behring Sea. They were all in the same position that I was; some steamers and some sailing vessels. The Pitcairn and the Rube Richardson were sailing vessels, both bound for Nome, with the same kind of cargo that I had. We were all trying to get there as soon as we could, as early as we could get there. We wanted to market our goods. The next morning after sighting the ice it was broken, but rather larger; larger in proportion. I do not know whether it was any thicker. It was about the same height out of the water. It was thicker as to the pieces being closer together. I kept on sailing through it all that day and all the next night. On the third day we could not get through it. We got in a lead, and we could not get through. I tacked ship and stood back again, and found a lead, I suppose 10 or 15 miles. I went right into it, still fighting to get up to Nome. I did not get through that lead. I got up about 10 miles and fell in with the Portland and another steamer. I fell in with two steamers and stopped in the ice with them; made fast to the ice and lay there two days. They were stuck in the ice. We lay there until we got a lead, and kept working up through it. We continued four or five hours after we got out of the last pack before we were stopped again. In the next lead I was in the company of two steamers, and the steamers left about 4 o'clock in the morning ahead of me through that lead and went on through out of sight. I got under way about 8 o'clock in the morning and started after them, and at about 11 o'clock, or 10 o'clock, I hit a piece of ice. The ice did not hit me. I hit it. My vessel ran into the ice. She hit it, and knocked her bow in, something like that desk there [indicating]. There was a piece of ice which I supposed I would go clear of, and down under water it stuck out like that desk, and hit her bow down under water. The ice was a great deal harder underneath than it would have been on top. It looked like fresh-water ice. The moment I struck the ice there was a hole in my bow. As soon as I felt her hit it, I put her bow on a cake of ice, so as to catch her there, so as she would not go down. I put my colors down, put the Union down in distress. When they sighted me they came down and stopped; that is the Richardson and the Pitcairn. They were coming down the lead astern of me, and they came up and made fast with me; one a little further off than the other. I signaled them for help. Some of the people from the Richardson and the Pitcairn got off their vessels and got on mine. They lay by me until I got towed away by the steamer. The

people from the Rube Richardson and the Pitcairn took some of the goods off the Sudden. They were out stores from between decks, mostly flour and lard, and such things as that, and I gave them leave to take them. I found the vessel was filling full of water, and it would be spoiled, and I gave them leave to take them. These stores were put away on the Sudden in the between-decks. The Sudden had two decks. Below that was the hold of the vessel. These stores and provisions were on the second deck. There was nothing on the upper deck in the way of provisions. I made no distinction, as between the provisions or stores belonging to the Nome Beach Lighterage & Transportation Company and those that belonged to other shippers, in giving them permission to go on board and take provisions. The men that had the other stores, their goods were all marked. They took perhaps altogether ten tons. Most of these belonged to the Nome Beach Lighterage & Transportation Company. I told the Rube Richardson people to take these goods, after they had taken them, to Cape Nome, and what salvage there was on them we would pay it. The Pitcairn people— All of our crew and everybody was board the Pitcairn. I did not say anything to him, because I thought they would eat them all up, as we would be there four or five days. The Corwin came in sight next day, and pumped the water out of my ship, and took it in tow, and carried us to Nome. I made an arrangement at that time with the Corwin people with regard to the lighterage plant that was on board. There was a written agreement signed at that time, as between myself and the captain of the Corwin, or the agent, or whoever he was. I think Capt. West was captain. This was signed on board of the Corwin before they started. It was drawn up and written after I had talked with the Corwin about the terms on which the lighterage plant was to be taken to Nome. I made no arrangement with the captain of the Corwin as to what he would charge for taking the hull of the Sudden to Nome. I made no arrangement with him at that time as to what he would charge for taking the cargo belonging to the Nome Beach Lighterage & Transportation Company to Nome. I did not enter into any arrangement with the captain of the Corwin at that time, or with anybody else on board of the Corwin at that time, as to what should be charged for saving anything, except the lighterage plant. I did not expect, and they did not expect, to save anything when they commenced on it. So I could not make any arrangement. I made no arrangement with them as to what the salvage service should be, or what the payment for it should be. The written agreement was signed before the water was pumped out of the Sudden and they started to Nome. After they got her up so that she could be towed, between that time and the time that we got to Nome, I did not enter into any arrangement with anybody on board of the Corwin looking to an arrangement of the charge they should make for salvage services for saving the goods on board of that ship."

At Nome the only anchorage is the open roadstead, and there the Sudden was anchored. It appears from the evidence that the weather was at the time good, and as a matter of fact continued good for a good many weeks; but it also appears that storms are liable to occur there at almost any time. The cargo had been wet with salt water for seven or eight days, and, so far as it consisted of groceries and canned goods, was greatly damaged. But the 150 tons of coal belonging to the defendant in error, and included within the property covered by the policy in question, was not much, if at all, damaged.

The defendant in error had sent to Nome as its agent one Morine, and given in his charge $3,000 of its money. Previous to the arrival of the Sudden Morine had disposed of most of that money and had become seriously ill. Because of his illness and his consequent inability to look after the interests of the defendant in error, he appointed Capt. Omar J. Humphrey in his stead to take charge of the Sudden and her cargo, and to represent the defendant in

error in respect thereto. Morine had no express authority to make such appointment, but it appears that his action in that regard was ratified by the company by letter of date July 2, 1900. Humphrey accepted the appointment, and upon the arrival of the Sudden, in tow of the Corwin, assumed the responsibility of the defendant in error in respect to the business in question. He arranged for the payment of the $2,500 stipulated to be paid for the salvage of the lighterage plant, and took possession of the same, which was first used—in accordance with the salvage agreement between the masters of the Sudden and the Corwin—in discharging the cargo of the latter. There is testimony to the effect that the reasonable value of the services of the lighter was $400 for 10 hours' work, and for the launch $50 a round trip of not exceeding one hour for each tow of the lighter.

It appears that at the time in question there were from 20,000 to 25,000 people at Nome, attracted there by the wonderful discoveries of gold. There were no courts nor regularly established government of any kind at the place; but the United States revenue cutter Bear, with its officers and men, was there. With the consent and approval of Humphrey, a survey, composed of the ship carpenter of the Bear, the president of the Chamber of Commerce of Nome, and an experienced shipmaster, was held upon the Sudden, and she and her cargo condemned. It was by them recommended that the vessel be sold, which was done. Upon the demand of the captain of the Corwin, and with the consent of Humphrey, the miscellaneous cargo of the Sudden was put up and sold. The auction was held in Nome, and the sale was made by manifest lots, the goods remaining in the hold of the vessel anchored off the beach, without examination by any buyer as to quantity, quality, or condition, and without any opportunity of such examination. The portion of the cargo owned by the defendant in error and covered by the policy in suit, sold at such sale, consisted of 150 tons of coal and 6,000 feet of lumber sawed, fitted, and ready to be put together as a house, and all of the insured merchandise, except the small lots taken by the Pitcairn, Rube Richardson, and Corwin, and was sold for the aggregate sum of $530, which amount was turned over to the Corwin. The evidence tends to show that neither Humphrey, nor Capt. Panno, nor any other person connected with the defendant in error, took any step or made any effort to secure an agreement with the salvors fixing a proper salvage charge, or to secure the unloading or delivery of the goods of the defendant in error subject to a salvage lien in favor of the salvors, or the unloading of those goods prior to the sale in order that the most advantageous prices might be obtained therefor at the sale, or with the view to the buying in of the goods in the event that there should not be buyers thereof at fair prices; in short, that no steps were taken, and nothing whatever was done by the defendant in error, nor by any one for or on its behalf, to minimize the loss. On the contrary, there is much evidence in the record tending to show that the sale was not made in good faith, but in furtherance of a design to dispose of the property in question at prices far below its real value. One pregnant circumstance tend-

ing to show this is testimony to the effect that of the 150 tons of coal belonging to the defendant in error 100 tons were bought by Humphrey for $4 a ton, the cost of lightering which from ship to shore was at the time only $18 a ton; whereas, it appears in the testimony that coal was at the time worth at Nome from $30 to $90 a ton, and that as a matter of fact Humphrey shortly thereafter sold a part of the same coal for $60 a ton. It is true that the sale was advertised in a paper published at Nome, and that during its progress it was interrupted by one Gollin, who announced himself as the agent of the San Francisco Board of Marine Underwriters (of which board the plaintiff in error is a member), and that at Gollin's request the sale was adjourned to enable him to make an investigation, and that he thereafter consented, as agent of the San Francisco Board of Underwriters, that the sale should continue. It is also true that Gollin testified on the trial of this case that the sale was "fair and square," and also that the general manager of the plaintiff in error testified that he thought the company should pay the loss as claimed by the insured. But it further appears that his company is reinsured for all but $1,000 of such loss, and that those reinsurers seriously object to such payment.

It will be thus seen that all of the insured articles in question, with the exception of such portions thereof as were taken on board the Corwin, Pitcairn, and Rube Richardson, arrived in specie at destination, and that the loss for which defendant in error sues (except as respects the lighterage plant) arose out of their sale at Nome under the circumstances indicated. The terms of the policy have been stated, under which it is clear that, in a case where the facts warrant it, a recovery may be had for a total loss, either actual or constructive, and for a partial loss, provided such loss be occasioned by stranding, sinking, fire, collision, or from any extraordinary peril insured against, and amounting to 50 per cent. on the sound value of the whole shipment at the port of delivery. A constructive total loss is one upon the happening of which the insured may abandon the subject-matter of the insurance. Unless there remains something of value to pass to the underwriter, there is, as a matter of course, nothing to abandon, and no case for the operation of the doctrine of abandonment. 1 Am. & Eng. Enc. of Law, pp. 5–13, and authorities there cited; Civ. Code Cal. §§ 2705, 2717.

It is said for the defendant in error that the merchandise cargo was a constructive total loss, for the reason that when it reached the roadstead at Nome it was still in peril, because of the constant danger of the Sudden going ashore. "Hence," argues counsel, "the cargo was, at the time of sale, by reason of a peril insured against, in danger of absolute destruction, and then and there the subject of abandonment." Undoubtedly so; but the trouble with counsel's point is that, so far as the evidence shows, the insured did not then, nor at any other time when the property was the subject of abandonment, undertake to abandon it. It is plain, therefore, that in so far as concerns the merchandise portion of the cargo in question there could, under the evidence, be no such thing as a constructive total loss; for long prior to the attempted abandonment all that

portion of the cargo had absolutely passed from the insured. It had nothing to abandon, and there was, therefore, in respect to it, an absolute total loss, or there was no such loss at all. Whether the case showed a loss amounting to 50 per cent. or more caused by sinking, and recoverable under the provision of the policy relating to that matter, is another question.

It is further contended for the defendant in error that there was a constructive total loss, for the reason that the danger of the Sudden going ashore at Nome rendered a sale of both vessel and cargo justifiable, and that, "where vessel or property is justifiably sold after damage by peril insured against and condemnation, it is a total loss without abandonment," within the rule declared in Gordon v. Massachusetts F. & M. Ins. Co., 2 Pick. 249. In that case the vessel insured, having received damage from the perils insured against, put into the harbor of St. Domingo. A survey was called, and the surveyors reported that she could not be repaired there, by reason of the want of materials and the extraordinary expense of making repairs at that place, without incurring an expense exceeding her value, and they therefore condemned her to be sold for the interest of whom it might concern, which was done. The purchaser afterwards refitted her for sea. It was held that the survey was not conclusive evidence of the necessity of the sale; that, if the sale were necessary, it would constitute a total loss without an abandonment, and in such case the plaintiff could recover for a total loss; but that in case of a constructive total loss he could recover only as for a partial loss, inasmuch as by the transfer he had put it out of his power to make an abandonment. The facts of that case were quite unlike those of the present one. Here the vessel, with her cargo, was anchored at Nome, in good weather, which continued for week⌐, and with a lighterage plant owned by the insured capable of discharging the cargo. There was no sale by the master of vessel or cargo for the benefit of whom it might concern, but a sale by the salvors to satisfy their lien. It is not doubted that a salvage service is a loss by a peril of the sea, and that, when it is found to equal or exceed half the value of the insured property, the insured may, under such a policy as that in suit, prior to a sale ordered to satisfy the lien of the salvors, abandon and claim as for a total loss. But in the present case there is neither a showing as to the amount of the damage to the cargo, nor that the value of the salvage services was ever ascertained. Unless the loss was at least equal to 50 per cent. of the sound value of the cargo at the port of delivery, there was, under the terms of the policy, no liability of the insured, and, as a matter of course, no forced sale of any kind could create one.

It is further contended on the part of the defendant in error, and was so contended in the court below, that the retention by the Pitcairn, Rube Richardson, and Corwin of such portions of the cargo in question as were taken on board those vessels (in quantity, according to the testimony, about ten tons; value not stated), and the sale by the Corwin of the balance of the merchandise cargo, constituted a total loss from a peril of the sea. The correctness of that

proposition was and is controverted by the plaintiff in error.   Upon the point the court below instructed the jury:

"The accident to the vessel, by which a hole was stove in her bow and she was almost submerged, was a peril of the sea from which the cargo under deck would have been lost, but for the intervention of the salvors who applied themselves to the rescue.   In this way the vessel and cargo came rightfully into the possession of the salvors, who thereupon, and after arriving at Nome with the vessel and cargo, claimed the whole of such cargo under deck for salvage service, and, so claiming, permanently deprived the owners of said property.   There were no tribunals at Nome authorized to determine the question of salvage, and no recognized authority in that behalf, other than the captain of the revenue cutter then at that place, and who, acting as arbiter in the matter, gave such cargo to the salvors, by whom it was sold, and thereby became and was a total loss to plaintiff within the meaning of the law, and for this loss the defendant is liable, unless the plaintiff might, with reasonable effort on its part, have arranged with the salvors for an adjustment of the salvage claim and the delivery to it of the said cargo."

We are of opinion that that instruction of the court was substantially correct (Monroe v. British & Foreign Ins. Co., 52 Fed. 787, 789, 3 C. C. A. 280), except so far as it stated that the captain of the revenue cutter then at Nome was a recognized authority for the determination of the question of salvage.   The evidence did not justify the statement that the question of salvage was submitted to the captain of the Bear by the parties in interest as arbitrator, and it is perfectly clear that, otherwise, he had no power in the premises; the question of salvage being a judicial one, of which a court of admiralty only has jurisdiction.   There is a good deal of force in the claim on the part of the plaintiff in error that it was entitled to the peremptory instruction requested by it, on the ground that there was no evidence tending to show any effort on the part of the insured to adjust the salvage or otherwise minimize the loss; but, in view of all of the circumstances of the case, we conclude that that question of fact was properly one for the determination of the jury.

In respect to the lighterage plant the plaintiff in error requested the court below to instruct the jury that the plaintiff to the action could not recover any of the consideration paid by it to the salvors for the salvage of that plant, or any portion of the value of such services, if in fact the plant or any material portion of it was not at the time of the salvage agreement in danger of being lost by reason of the injury to the Sudden.   That request was refused, and instead the court instructed the jury as follows:

"It does not appear that any injury or damage resulted to the lighterage plant from the accident to the Catherine Sudden, or that the plaintiff suffered any loss or damage, as to said plant, within the protection of the policy, except in so far as plaintiff was compelled to pay salvage for the towing of said lighterage plant from the place of the accident to Nome.   As to such loss, the stipulation of the policy is to the effect that, in case of loss or misfortune resulting from any peril insured against, the insured is to sue, labor, and travel, and use all reasonable and proper means for the security, preservation, and recovery of the property insured, for the expense of which the insurer will contribute in proportion as the sum insured is to the whole sum at risk.   The extent of the defendant's liability under this clause, as to the lighterage plant, is such proportion of the cost of saving the plant as the amount for which the plant was insured bore to its valuation, as stated in the policy, which valuation is $3,000.   And with respect to said plant, if you find that the Catherine

Sudden was seaworthy for the voyage, the plaintiff is entitled to recover the $2,500 paid for its salvage, plus the reasonable value of the services rendered by the launch and barge in the discharge of the Corwin at Nome."

The claim of the plaintiff in error that the court was in error in refusing the peremptory instruction requested is based upon the rule laid down by Mr. Barber:

"Where the insurance is against total loss only, a claim for expenses incurred under the suing and laboring clause will be disallowed, where it is evident from the facts of the case that no danger of a total loss existed." Barber, Prin. Law Ins. p. 370.

The reason for the rule, as stated by Barber and in the cases cited by him, is that the insurer, being liable only for a total loss, is not interested in the prevention of anything less than a total loss, and cannot properly be called upon to contribute to an expense incurred to prevent a loss in which it is not concerned. But in the present case, as has been seen, the insurance was not against total loss only, but against actual and constructive total loss, and against partial loss, if occasioned by stranding, sinking, fire, collision, or other extraordinary peril insured against and amounting to 50 per cent. or more on the sound value of the whole shipment at the port of delivery. The valuation fixed in the policy is conclusive between the parties.

In Arnold on Insurance (7th Ed.) p. 411, it is said:

"There is by English law no exception to the rule under discussion. As long as the contract of insurance remains unimpeached, the valuation in the policy can under no circumstances be opened; or, to use the words of Cockburn, C. J., 'where the value is stated in the policy in a manner to be conclusive between the two parties, the insurer and the insured, as regards the value, then in respect of all rights and obligations which arise upon the policy of insurance the parties are estopped' from disputing the value stated."

In The Potomac v. Cannon, 105 U. S. 630, 26 L. Ed. 1194, the Supreme Court said, concerning such valuation:

"That valuation is conclusive in respect of all rights and obligations arising upon the policy of insurance."

In section 2736 of the Civil Code of California the law is thus declared:

"A valuation in a policy of marine insurance is conclusive between the parties thereto in the adjustment of either a partial or a total loss, if the insured has some interest at risk."

We think the court below rightly held the "sum at risk" to be fixed by the terms of the policy. The circumstance that that sum happens, in the case in hand, to equal the sum insured, thereby obligating the insurer to pay the whole, instead of a part, of the expenses incurred under the "sue and labor" clause of the policy, does not change the binding character of the valuation. We are of opinion that the instruction under discussion was correct.

It appears, however, from the testimony of the master himself, that he well knew of the existence of the ice and of the risk incurred in endeavoring to push through it, and that he well knew all of this in ample time to have avoided it. Can it be properly held that it was not his duty to have avoided the danger—that he did not com-

mit a wrongful act when he deliberately, willfully, undertook to "fight" his way, as he himself expressed it, through the ice, for the purpose of arriving quickly at Nome, and thus secure for his principals a better price for the merchandise, and that they might the sooner realize the profits expected to accrue from the lighterage plant that he carried? We think this must be answered in the negative. Taking the captain's testimony to be true, it is not, in our opinion, a case of negligence at all, whether simple or gross, but one of a deliberate and reckless assumption of a well-known danger, which the law made it the master's duty to have avoided. It was both a willful omission to perform his legal duty, and an intentional commission of a wrongful act, resulting in the loss in question, for which, both upon principle and authority, the insurer, in our opinion, is not liable. In the first place, we think the liability asserted does not exist because of that provision of the Civil Code of California expressly made a part of the policy in suit, declaring that:

"An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of his agents, or others." Section 2629, Civ. Code.

Speaking of that statutory provision the Supreme Court of the state said, in the case of McKenzie v. Scottish U. & N. Ins. Co., 112 Cal. 548, 557, 44 Pac. 922:

"The ordinary negligence of the insured and his agents has long been held as a part of the risk which the insurer takes upon himself, and the existence of which, where it is the proximate cause of the loss, does not absolve the insurer from liability. But willful exposure, gross negligence, negligence amounting to misconduct, etc., have often been held to release the insurer from such liability. To set at rest questions involving the different degrees of negligence, and the results following therefrom, we may reasonably suppose was the object of the framers of our Civil Code. Under section 2629 of the Civil Code the nice distinctions often made necessary are dispensed with, and the general proposition is established that no form of negligence on the part of the insured, or his agents or others, leading to a loss, avoids the policy, unless it amounts to a willful act on the part of the insured. The Code thereby sets at rest a fruitful cause of litigation. This section was not intended, however, to absolve the insured from the performance of those acts which he has expressly covenanted to perform. To do this would be, not to measure his conduct and obligations under the contract, but to abrogate it. When the insured in the present case warranted, in case the mill was idle and not in use, to have a watchman on duty constantly day and night, in and immediately about the buildings or works, he bound himself to the performance of specific acts, from the performance of which no negligence could exonerate him."

But while, under the statute cited, negligence on the part of the insured, whatever the degree, does not exonerate the insurer, he is relieved of responsibility for loss occasioned by "the willful act of the assured." The court below instructed the jury that by this latter provision—

"Is not meant an act intentionally or negligently done, resulting in the loss of the insured property, even though the negligence be gross; but the act must be one concurred [in] by the insured with the corrupt design of destroying the property."

It is, in our opinion, impossible to sustain that construction of the California statute. "Negligence and willfulness are the op-

posites of each other. They indicate radically different mental states. * * * Negligence is also to be carefully distinguished from fraud; the distinction arising in this case, as before, upon the element of inadvertence. Fraud is invariably intentional, either actually or constructively; negligence is never so." 16 Am. & Eng. Enc. of Law, pp. 395, 396, and cases there cited. In negligence, as said by Beardley, J., in Gardner v. Heartt, 3 Denio (N. Y.) 232, "whatever may be its grade, there is no purpose to do a wrongful act or to omit the performance of a duty." But an intent to do a wrongful act or to omit the performance of a duty is necessarily willful. Such willfulness may fall short of fraud, against which, on the part of the assured, the policy in suit insured; for it covered barratry of the master and mariners. The distinction was very clearly pointed out by Chief Justice Shaw in the case of Chandler v. Worcester Mutual Fire Ins. Co., 3 Cush. 328. That was an action upon a fire insurance policy, in which the defendants admitted the making of the contract, the loss within the time, and all the facts necessary to constitute a prima facie case for the plaintiff. They also admitted that there was no fraudulent design to set fire to the building insured, and declared that no evidence of that sort would be offered. The defendants proposed to show, and as matter of defense rely on proof of, the gross negligence and carelessness and the gross misconduct of the plaintiff as the cause of the loss. On the offer of this evidence the trial judge ruled that proof of the gross negligence and carelessness and of the gross misconduct of the assured, as the cause of the destruction of the building by fire, would constitute no defense to the action, and thereupon rejected the evidence. The court, speaking through Chief Justice Shaw, said:

"The general rule unquestionably is, in case of insurance against fire, that the carelessness and negligence of the agents and servants of the assured constitute no defense. Whether the same rule will apply equally to a case where a loss has occurred by means which the assured by ordinary care could have prevented is a different question. Some of the cases countenance this distinction. Lyon v. Mells, 5 East, 428; Pipon v. Cope, 1 Campb. 434. But it is not necessary to decide this question. The defendants offered to prove gross misconduct on the part of the assured. How this misconduct was to be shown, and in what acts it consisted, is not stated. The question, then, is whether there can be any misconduct, however gross, not amounting to a fraudulent intent to burn the building, which will deprive the assured of his right to recover. We think there may be. By an intent to burn the building we understand a purpose manifested and followed by some act done tending to carry that purpose into effect, but not including a mere nonfeasance. Suppose the assured, in his own house, sees the burning coals in the fireplace roll down onto the wooden floor, and does not brush them up. This would be mere nonfeasance. It would not prove an intent to burn the building; but it would show a culpable recklessness and indifference to the rights of others. Suppose the premises insured should take fire, and the flame began to kindle in a small spot, which a cup of water would put out, and the assured has the water at hand, but neglects to put it on. This is mere nonfeasance; yet no one would doubt that it is culpable negligence, in violation of the maxim, 'Sic utere tuo ut alienum non lædas.' To what extent such negligence must go, in order to amount to gross misconduct, it is difficult, by any definitive or abstract rule of law, independently of circumstances, to designate. The doctrine of the civil law, that 'crassa negligentia' was of itself proof of fraud, or equivalent to fraudulent purpose or design, was no doubt founded in the considera-

tion that, although such negligence consists in doing nothing, and is therefore a nonfeasance, yet the doing of nothing, when the slightest care or attention would prevent a great injury, manifests a willingness, differing little in character from a fraudulent and criminal purpose, to commit such injury. Whether the facts relied on to show gross negligence and gross misconduct, of which evidence was offered, would have proved any one of these supposed cases, or any like case, we have no means of knowing; but, as they might have done so, the court are of opinion that the proof should have been admitted, and proper instructions given in reference to it. The terms 'slight negligence,' 'want of ordinary care,' and 'gross negligence' are useful in their way; but they are not precise and exact enough, without a statement of the facts designated by them, to enable a court to judge of the rights of parties thereby affected. The proper business of jurisprudence seems to be to take a series of facts and circumstances, conceded or proved, and to declare what are the rights of the parties arising out of them."

In the case of Williams v. New England Insurance Co., 3 Cliff. 244, Fed. Cas. No. 17,731, the owners of an insured vessel attempted to put her across the bar at Hatteras Inlet. She struck on the bar and was wrecked. The master knew that the depth of water on the bar was such as to make the attempted passage dangerous. Judge Clifford held that, under the circumstances, the loss was not within the protection of the policy, saying:

"Authorities to prove that persons insured cannot recover for a loss occasioned by their own wrongful acts are hardly necessary, as the proposition involves an elementary principle of universal application. Losses may be recovered by the insured, though remotely occasioned by the negligence or misconduct of the master or crew, if proximately caused by the perils insured against, because such mistakes and negligence are incident to navigation and constitute a part of the perils which those who engage in such adventures are obliged to incur; but it was never supposed that the insured could recover indemnity for a loss occasioned by his own wrongful act or by that of any agent for whose conduct he was responsible." Citing Thompson v. Hopper, 6 El. & Bl. 944; Marsh, Ins. 376; American Ins. Co. v. Ogden, 20 Wend. 305; Bell v. Carstairs, 14 East, 374; Cleveland v. Union Ins. Co., 8 Mass. 308.

The case of Orient Insurance Co. v. Adams, 123 U. S. 67, 8 Sup. Ct. 68, 31 L. Ed. 63, was, like the present, an action to recover on a policy of marine insurance. The insured sued as for a total loss arising from one of the perils specified in the policy. The insurance company pleaded non assumpsit and payment, with leave to give in evidence the matters set forth in its affidavit of defense, which was adopted as a special plea. According to the bill of exceptions in the case, there was evidence in behalf of the plaintiffs tending to show that, without willfulness or design on the part of her captain, the vessel was carried, April 28, 1880, before the expiration of the policy, over the falls of the Ohio river, at Louisville, Ky., and sunk, receiving damage in a sum equal to 50 per cent. of her agreed value, and that on the 18th of May, 1880, it being apparently impracticable to float her off and repair her, the vessel was abandoned as a total loss, and the sum due under the policy demanded. The evidence introduced by the company tended to establish, among other things, these facts: The master of the Alice (the vessel in question) was C. F. Adams, one of the assured, and a son of the other plaintiff. Before the sailing of the vessel he had the reputation of being a "drinking" man, and of that fact his father was informed. On her arrival at Louisville, on the morning of April 28, 1880, the

master gave the usual signal (which was transmitted to the engineer) that he had no present need of the engines. The joint of the mud valve was out of order, threatening damage to the freight, and making repairs necessary. The steam was thereupon blown off in order to make repairs. The captain, coming on board, saw that repairs were going on, and knew that the mud valve connected with the boiler needed repairs. The work of repairing made it necessary to blow off steam. The captain subsequently went on deck, and, without making inquiry of the engineer as to the condition of the steam, or receiving any notice from him that steam was ready, tapped his bell at about 8:30 a. m. as a signal to let go the boat. At that time there was not sufficient steam to propel the vessel. It is the custom of the river for the master, before giving the order to let go, to inquire of the engineer as to the condition of the steam, and await his reply that the steam is ready before giving the order to let go. Upon being let go she was carried by the current down the river and over the falls, and, striking a pier, was badly damaged, in consequence of which she sunk soon thereafter below the bridge in about 18 feet of water. The plaintiffs thereafter offered, among other things, evidence tending to show that "it was the custom of the river that the engineer should give notice to the captain before exhausting steam, and that it was not the custom for the captain to have notice from the engineer that steam was ready before giving the order to let go." The court, at the request of the plaintiffs and against the objections of the company, instructed the jury that "where a loss under a policy of insurance, such as the one in suit, happens from the perils of the river, it is not a defense to the insurance company that the remote cause of loss was the negligence of the insured or his agents," and that "the mere fault or negligence of the captain of the vessel, by which the Alice was drifted into the current and drawn over the falls, will not constitute a defense for the company, unless the jury should be satisfied that the captain acted fraudulently or willfully, with design in so doing." The theory of the defense was disclosed by the request to instruct the jury that, if they "are satisfied from the evidence that the accident and loss was caused by the misconduct of Capt. Charles F. Adams, then the plaintiff cannot recover." This request was denied, but the court said to the jury:

"This is true, if the jury is satisfied that the conduct of the captain is properly characterized. If he designedly or recklessly exposed the vessel to the dangers of navigation at the falls, knowing that she was not in a condition to encounter them, he was guilty of misconduct such as would relieve the defendant from liability; but if the proximate cause of the loss was the stranding of the vessel, this was covered by the policy, and the defendant is not relieved from liability by showing that the loss was remotely ascribable to the negligence of the captain or the other officers or employés."

The Supreme Court said:

"We do not perceive anything in these instructions of which the insurance company can rightfully complain. The court proceeded upon the ground that if the efficient, and therefore proximate, cause of the loss was a peril of the river, the company could not escape liability by showing that the loss was remotely caused by mere negligence in not ascertaining, before giving the

signal to let the vessel go, that she had steam enough for her proper management. The court committed no error in so ruling."

And after referring to various cases the Supreme Court further said:

"But it is insisted that the court should have granted the request of the company to the effect that it was not liable if the accident and loss were caused by the 'misconduct' of the master. Had that request been granted in the form asked, the jury might have supposed that the company was relieved from liability if the master was chargeable with what is sometimes described as gross negligence, as distinguished from simple negligence. Hence the court properly said, in effect, that the misconduct of the master, unless affected by fraud or design, would not defeat a recovery on the policy."

Thereby was recognized the distinction above pointed out between negligence, fraud, and a willful exposure to known dangers.

The doctrine of respondeat superior being applicable to the case (Phillips on Insurance, Vol. 1, § 1056; Orient Ins. Co. v. Adams, supra; American Ins. Co. v. Insley, 7 Pa. 223, 47 Am. Dec. 509), it follows that if Capt. Panno did, with knowledge of the dangers to be encountered and with ample time to have avoided them, designedly undertake to force the Sudden through the ice in order to reach Nome quickly, that his principals might gain pecuniary advantage, he was guilty of the willfulness which the California statute declares relieves the insurer of liability, and the jury should have been so instructed by the court below. This construction of the California statute is, as shown above, in accord with the general law upon the subject.

For the reasons stated, the judgment is reversed, and the cause remanded to the court below for further proceedings not inconsistent with this opinion.