[Civ. No. 22411.   Second Dist., Div. Two.   Jan. 22, 1958.]

CITY OF SANTA MONICA, Appellant, v. ROYAL IN-
DEMNITY COMPANY (a Corporation), Respondent.

Robert G. Cockins, City Attorney, Robert D. Ogle, Assistant City Attorney, and James W. Shumar, Deputy City Attorney, for Appellant.

Dryden, Harrington, Horgan & Swartz, Jacob Swartz and Vernon G. Foster for Respondent.

ASHBURN, J.—Plaintiff City of Santa Monica, having been held liable in a personal injury action, sues defendant Royal Indemnity Company to recover the amount it has had to

pay out, i.e., $5,130.40 plus expense of defense in the sum of $291.60. The court denied recovery of any sum in excess of $291.60, and plaintiff appeals from the judgment.

The Promenade is a public way within the city of Santa Monica. In January, 1953, the city and Venice Electric Tram Company entered into a written agreement whereby the company was given a concession to operate its trams upon the Promenade for a period of five years. The agreement contains this provision: ''Concessionaire will carry liability insurance protecting the City, members of its City Council, boards or commissions, officers, agents and employees while acting as such, in a form approved by the City Attorney in the following amounts: $10,000 property damage and for personal injury $100,000 for any 1 person and $300,000 for any 1 accident.''

Effective August 6, 1952, the Tram Company had obtained from defendant Royal Indemnity Company an automobile liability policy covering all trams owned or operated by it for the transportation of passengers. The primary coverage reads as follows: ''Coverage A—Bodily Injury Liability. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile.'' By endorsement bearing the same date as the policy, August 6, 1952, the coverage was limited to operations in Venice, Sacramento Fair and Fresno Fair; ''any additional exposures shall be reported to the company and premium determined for same.'' By endorsement effective August 7, 1952, the coverage was extended to operations in Santa Monica and the city was added as an additional insured. ''In consideration of an additional premium of $500. (B.I. $400. and P.D. $100.) It is hereby understood and agreed the undermentioned policy is amended in the following particulars: (1) Insurance extended to cover operations in the City of Santa Monica. (2) The City of Santa Monica is included as an additional insured.'' Another rider of same date says: ''It is hereby understood and agreed that the undermentioned policy is extended to apply in respect of the following additional insured: 'The City of Santa Monica a municipal corporation and/or members of its City Council Boards or Commissions, and elective appointive officers, agents, servants and employees while acting as such.' It is further agreed that this extension shall apply only in respect of the operations of Venice Electric Tram Company within

the municipal jurisdiction of the City of Santa Monica.'' A third endorsement of August 7 reads: ''*Cross Liability Endorsement.* In consideration of the Premium charged, such insurance as is afforded by this policy for bodily injury and for property damage liability shall apply separately for each named insured as though a separate policy were issued to each named insured provided that this endorsement shall not operate to increase the company's limit of liability for each occurrence as stated herein.''

In July, 1953, two tram passengers named Resnick were injured when the wheel of the tram passed over a defective manhole of the city. It is stipulated that the Tram Company was not negligent. Resnick sued it and the city. The company was found not liable and judgment was rendered against the city for $5,130.40, which it ultimately paid. It made demand but the insurance company refused to defend it. The city also demanded that the insurance company pay the judgment and it declined to do so. Having brought this action against the insurer the city, as above indicated, recovered only its costs of defense.

Appellant argues that: ''The court must have accepted defendant's contention that this is a combined automobile policy and it is fundamental that the insurer is not liable for injuries unless proximately caused by the automobile.'' It further says that this renders Coverage A meaningless so far as the city is concerned. It emphasizes that ''the dispute is over the meaning of the phrase 'arising out of.' '' Respondent invokes section 530, Insurance Code: ''An insurer is liable for a loss of which a peril insured against was the proximate cause, although a peril not contemplated by the contract may have been a remote cause of the loss; but he is not liable for a loss of which the peril insured against was only a remote cause.''

Respondent also argues that an endorsement naming an additional insured under an existing policy does not extend the terms of the policy or increase the risks thereby covered. Counsel rely upon *Oakland Stadium* v. *Underwriters at Lloyd's,* 152 Cal.App.2d 292 [313 P.2d 602], as support for this proposition, but, as later shown herein, the citation is misplaced. From this predicate counsel proceed to the conclusion that the coverage is limited to injuries caused by accident arising out of ownership, maintenance or use of the automobiles (trams) and that that risk must be the proximate cause of the injury under section 530, Insurance Code. We find this to be not the true perspective.

The cardinal rules for construction of an insurance policy are stated in *Continental Cas. Co.* v. *Phoenix Const. Co.*, 46 Cal.2d 423, 437 [296 P.2d 801] : "It is elementary in insurance law that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. [Citations.] If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates. [Citation.] If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against [citations], the amount of liability [citations] or the person or persons protected [citations], the language will be understood in its most inclusive sense, for the benefit of the insured." It follows that the policy or its endorsements cannot be so interpreted as to become meaningless, or to withhold coverage which the layman would normally expect from it. "The understanding of an ordinary person is the standard used in construing a contract of insurance, and any ambiguity in language must be resolved against the insurer. [Citation.] It is also the rule that exceptions and exclusions are construed strictly against the insurer and liberally in favor of the insured." (*Arenson* v. *National Automobile & Cas. Ins. Co.*, 45 Cal.2d 81, 83 [286 P.2d 816].) "If to give the quoted clause the meaning contended for would release [defendant] from liability, then it must be construed so as to permit recovery since it is 'susceptible of such construction.' Where two interpretations equally fair may be made, that which affords the greatest measure of protection to the assured will prevail." (*Fageol T. & C. Co.* v. *Pacific Indemnity Co.*, 18 Cal.2d 731, 747 [117 P.2d 661].) "The language of the policy is presumed to be that of the insurer and when ambiguous it is to be construed in such manner as to provide full coverage of the indicated risk rather than to narrow the protection. If the insurer would create an exception to the general import of the principal coverage clauses, the burden rests upon it to phrase that exception in clear and unmistakable language. [Citation.] If this is not done any ambiguity or uncertainty is resolved in favor of the policyholder. The courts will not sanction a construction of the insurer's language that will defeat the very purpose or object of the insurance. [Citations.] Indeed an exception must be couched in terms which are 'clear to the ordinary mind' [citation], or any doubts as to meaning will

be resolved against the insurer." (*Osborne* v. *Security Ins. Co.*, 155 Cal.App.2d 201, 207-208 [318 P.2d 94].)

■■■ There is no room for doubt that the accident in question arose out of the use of the automobile. Concerning the pertinent phrase of the policy *Schmidt* v. *Utilities Ins. Co.*, 353 Mo. 213 [182 S.W.2d 181, 183, 154 A.L.R. 1088], says: "The words of the policy are 'caused by accident and arising out of . . . use of the automobile.' The words 'arising out of . . . use' are very broad, general and comprehensive terms. The insurer made no attempt to limit the plain, usual and ordinary meaning of the terms used. We find nothing in the policy requiring that the ownership, maintenance, or use of the automobile shall be the direct and 'efficient cause of the injuries sustained,' as appellant contends." *American Auto. Ins. Co.* v. *American Fid. & Cas. Co.*, 106 Cal.App.2d 630, 637 [235 P.2d 645]: "Under defendant's policy it is liable for damages because of injury to property caused by accident and arising out of the *use* of the motor vehicle. Such a policy does not require that the injury be a direct and proximate result, in any strict legal sense of that term, of the use of the motor vehicle covered by the policy."

It may be conceded that so far as the Tram Company is concerned the peril insured against is the use of the automobile and the predicate for defendant's liability to it must be a showing that that peril was a proximate cause of the accident. But a different question is presented with respect to the additional insured, the city of Santa Monica. In reference to it the controlling question is, what was the peril against which the city of Santa Monica was insured and which must operate as the proximate cause of the loss under section 530, Insurance Code. The city was brought under the policy by an endorsement for which the Tram Company paid a premium of $500, and one of defendant's letters in evidence, which encloses a duplicate policy for the city, suggests that if the city would accept the policy with "their interest eliminated from coverage" the charge would be reduced to the extent of $160. It is a fair inference that that sum of $160 was the charge for insuring the city. Against what risk?

The city is not engaged in operating trams (the subject automobiles). But they do travel over its public way. The mere operation of the vehicle, negligently or carefully, cannot render the city liable for any accident. But its operation over the public street is the event which threatens the city's pocketbook; the risk is that of liability for some act or omission of

the city in relation to its street which concurs with operation of the automobile and creates liability on the city. That is the peril against which the city was insistent upon protection. The concession for operation of trams on its public way did expose it to the hazard of liability to passengers in the event of accident and injury growing out of the operation of the vehicle over a dangerous and defective public way. That is undoubtedly the risk that the endorsement was intended to cover; it is difficult to conceive of any other upon a rational basis. The concurrence of this risk with the operation of the tram was the proximate cause of the accident and injuries. The "Cross Liability Endorsement" above quoted attests this fact. It says that the insurance "shall apply separately for each named insured as though a separate policy were issued to each named insured,"—which means the city of Santa Monica. The rider then adds the proviso "that this endorsement shall not operate to increase the company's limit of liability for each occurrence as stated herein,"—shall not increase the policy limit. The instrument does not say that it shall not increase the risks which would be covered in the absence of a rider adding another insured. To hold that the risk of liability for the results of a defective street cooperating with operation of the tram to cause an injury,—that that risk was not covered would be to sanction the acceptance of a $160 premium for the issuance of a meaningless policy, one which afforded no protection whatever. We cannot embrace any such concept of justice.

Counsel for respondent went almost that far in their oral argument. They said that the city was given only an assurance of a defense against groundless suits (under IIa of the policy), an obligation which counsel conceded to have been breached;[1] they also argued that, an unsuccessful defense having been afforded, the insurance company owes no further duty and the additional insured must pay the judgment. Concerning this matter it is said in *Osborne* v. *Security Ins. Co., supra,* 155 Cal.App.2d 201, 206: "An insurer who has undertaken such defense is bound by the judgment (45 C.J.S. § 933, p. 1055), and if the defense proves unsuccessful the insurer must pay the judgment. This latter phase of Mrs. Thwaits' right to protection was not declared in the judgment but that should have been done."

---

[1]Their brief says the Resnicks charged "negligence in the operation of the tram and a dangerous and defective condition in the Promenade and the manhole cover thereon."

*Oakland Stadium* v. *Underwriters at Lloyd's, supra,* 152 Cal.App.2d 292, is not opposed to the views above expressed. The effort there made by the additional insured was to import into the policy (through the endorsement) an obligation which was expressly negated by the terms of the policy.

The court's award to plaintiff of only $291.60, the cost of its defense, is erroneous.

The judgment is reversed with instructions to amend the conclusions to conform to the views herein expressed, and to enter judgment in favor of plaintiff for $5,130.40, plus $291.60.

Fox, Acting P. J., and Kincaid, J. pro tem.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 19, 1958. Schauer, J., was of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.