[Civ. No. 23070. Second Dist., Div. Two. Oct. 9, 1958.]

RUSS-FIELD CORPORATION (a Corporation), Respondent, v. UNDERWRITERS AT LLOYD'S, LONDON, ENGLAND et al., Appellants.

*Assigned by Chairman of Judicial Council.

Spray, Gould & Bowers for Appellants.

Zagon, Aaron & Sandler and Nelson Rosen for Respondent.

HERNDON, J.—The questions presented by this appeal relate to the scope of the coverage of a rather special and unique contract of insurance issued by the Underwriters at Lloyds, London, and denominated "Feature Motion Picture Errors and Omissions Insurance for Studios and/or Distributors." The trial court held that the claim which gave rise to the loss in question constituted a risk within the coverage of the policy and accordingly rendered judgment for plaintiff, the insured. The defendant insurance carriers have appealed.

Plaintiff, a producer of motion pictures, owned the motion picture rights to a literary property entitled "The Most Dangerous Game." Early in 1955 plaintiff engaged Henry Tatelman as producer, vesting him with authority to supervise the production of a motion picture based upon that story. In February, 1955, Tatelman commenced preparations for the production by employing Robert Wilder, a screen writer, who proceeded at once to prepare a draft of the script for a motion picture entitled "Run For the Sun." Tatelman thereafter also employed other necessary personnel, including a director and various actors, one of whom was Mr. Leo Genn.

Mr. Genn, a resident of England, was under contract to render his services as an actor for the Genn Company, and Mr. Tatelman negotiated for the services of the actor through the William Morris Agency, which had local offices and acted as agent for Mr. Genn and the Genn Company. Mr. Tatelman submitted the Wilder script, which was designated as "a first draft screen play," for Mr. Genn's examination. Thereafter, in August, 1955, the Genn Company, acting through the Morris Agency, entered into an oral agreement with plaintiff to furnish the services of Leo Genn to portray the role of "Martel" in the Wilder script. Plaintiff agreed to pay Genn the sum of $3,500 per week for a minimum of 10 weeks and to furnish Genn round-trip transportation from London,

England, to Mexico City, together with certain other emoluments.

Thereafter, in order to secure a desirable director and to overcome certain censorship objections which had been raised, plaintiff employed Mr. Dudley Nichols to revise and rewrite the Wilder script. There was no express contractual provision in the agreement with Mr. Genn giving the actor script approval, and there is testimony in the record that Mr. Tatelman had the script revised on the assumption and in the belief that, pursuant to custom and usage in the industry, the producer had the right to control the script and to make such changes as it deemed desirable to improve the picture. Both Mr. Tatelman and Mr. Nichols testified that they did not anticipate any objection by Mr. Genn to the changes they made in the Wilder screenplay. Although the Nichols screenplay substantially retained the story line and plot of the first script, the name of the character which Mr. Genn was to play was changed from "Martel" to "Browne" and his nationality and characterization changed from that of a German Nazi official to that of an English traitor. The Nichols screenplay was completed late in October, 1955, and plaintiff made arrangements to commence principal photography from this screenplay on or about October 31.

Meanwhile, on October 17, 1955, the two policies of insurance which are the subject of this action were issued to plaintiff by defendants' agents covenanting to indemnify 90 per cent of certain enumerated losses which might be sustained by plaintiff in connection with the production and distribution of the picture "Run For the Sun." The most pertinent provisions of the policy read as follows:

"1. This insurance, subject to the terms, conditions, limitations and warranties hereinafter mentioned, covers . . . the 'Insured' for loss, liability, costs and expenses (hereinafter referred to as 'loss') arising from any claim or claims which may be made by any person or persons, firms, or corporations, against the insured by reason of any negligent act, error or omission in connection with the production of Feature Length Motion Pictures, . . . or any infringement of property or patent rights, or breach of contract rights, or invasion of the rights of privacy (whether under common or statutory law,) or defamation, or slander, or libel, or plagiarism, or any violation of copyright (whether under common or statutory law) arising out of said Motion Pictures, wherever com-

mitted or alleged to have been committed by the Insured. . . .

. . . . . . . . . . . . . .

"6. The Insured warrants that as of the effective date of this Insurance and with respect to any coverage granted by this Insurance, it knows of no act, error or omission which might form the basis of a claim against it or in respect of which a claim has already been made against it except as specifically enumerated in this Insurance.

. . . . . . . . . . . . . .

"7. It is understood and agreed that the Underwriters shall be liable only for loss arising from any claim or claims made against the Insured during the effective period of this Insurance or within three (3) years thereafter in respect of any Motion Picture covered hereunder, whether the production of any such Motion Picture shall have been commenced during said effective period or prior thereto, with said liability being limited to that proportion of the loss resulting from any such claim as shall apply to any such Motion Picture or repetition or continuation of loss from any such claim as a result of the continued distribution of such Motion Picture during the effective period of this Insurance."

Within a week or so after the delivery of the certificates, counsel for plaintiff informed the insurance brokers that he thought Clause 7 was ambiguous and requested a clarification. Pursuant to this request, the insurer issued Endorsement Number 2 dated October 31, 1955, the pertinent portion of which reads as follows: "It is further understood and agreed that Clause No. 7 is deleted in its entirety, and the following substituted therefor: 'Underwriters shall not be liable for loss arising from or by reason of: (a). Any claim, suit or action unless it arises on a picture placed in production during the term of this insurance or on a picture released or first licensed for use during the term of this insurance, and any distribution during or subsequent to the term of this Certificate. (b). Any claim, suit or action unless notice of such claim, suit or action be given to the Underwriters within three years of the expiration or termination date of this Certificate."

The foregoing endorsement was transmitted to plaintiff's attorneys on or about November 8, 1955. The attorneys found the endorsement unsatisfactory, and later notified defendants' agents that it was unacceptable to plaintiff. Although the matter is not of controlling importance, it is to be noted that

the trial court held that the endorsement was effective and became a part of the contract.

On or about October 21, 1955, Leo Genn arrived in Los Angeles from England, and was furnished with a copy of the final draft of the screen play as rewritten and revised. At a meeting held on October 22, 1955, Genn informed plaintiff's representatives that the role of "Browne" was not a proper vehicle for his artistic talents and would detract from his reputation and standing in the motion picture industry. Mr. Genn declared his refusal to accept said role, but stated that he stood ready to perform the role of "Martel" based upon the original Wilder screen play. This was the first time that plaintiff, or its representatives, learned that Genn had any objection to the changes and revisions in the script.

In the meantime plaintiff had made arrangements and commitments to commence principal photography based upon the revised script on or about October 31. Plaintiff offered to attempt to make changes in the revised script in an effort to overcome Genn's objections, but he remained adamant in his refusal to appear in the picture unless it was made upon the original Wilder script in which he would play the role of "Martel." Plaintiff refused to utilize Genn's services on this basis and employed another actor to portray the role of "Browne."

On or about November 1, 1955, Genn Company asserted a claim against plaintiff alleging that plaintiff had breached its obligations under the contract whereby Genn was employed and demanded payment of damages in the sum of $35,000 plus traveling and living expenses in excess of $4,000. On November 7, 1955, Genn Company instituted legal action against plaintiff wherein it sought recovery of damages in the sum of approximately $39,000, together with interest and costs. Plaintiff immediately notified defendant insurance carriers of the making of the claim and of the filing of the legal action by Genn Company. On March 12, 1956, defendants advised plaintiff that it was their position that the insurance issued by defendants did not cover the claim asserted . by Genn Company.

Upon the assertion of the claim by Genn, plaintiff caused its attorneys to investigate the facts and circumstances involved in the controversy. After completing their investigations, plaintiff's counsel recommended that an attempt be made to settle the case upon a reasonable basis. On May 9, 1956, after various negotiations, plaintiff paid to Genn Com-

pany the sum of $11,500 by way of compromise and settlement of Genn's claim. This settlement was recommended by plaintiff's counsel.

Plaintiff thereafter instituted the instant action on the insurance contract. After a nonjury trial judgment was rendered for plaintiff in the sum of $11,250, representing 90 per cent of the settlement with Mr. Genn plus the reasonable value of attorneys' services as provided in the policy. The trial court found: that plaintiff notified defendants immediately on receiving knowledge of Mr. Genn's claim; that the compromise settlement was made by plaintiff in good faith; that the settlement was prudent and reasonable in view of the facts and circumstances; that plaintiff neither knew nor should have known of Mr. Genn's claim at the time of applying for insurance or on the effective date thereof; and that "[t]he certificates issued by defendants indemnify plaintiff against loss resulting from breach of contract rights either committed or alleged to have been committed by plaintiff." The court expressly refrained from finding whether plaintiff actually breached the contract with Mr. Genn, but found that "if there were such a breach, it was not an intentional or wilful or deliberate breach" but one which resulted from negligence "in the ordinary course of business."

Appellants' first contention is that the insured event occurred prior to October 17, 1955, the effective date of the policy, and that plaintiff's loss, therefore, is not covered. In the supplement to their opening brief, appellants state their contention as follows: "It also clearly appears that the changes in the script were material, and that they were made before the effective date of the certificates of insurance. The alleged breach of contract by plaintiff, or in the alternative, its alleged negligent act, error or omission in that respect, occurred before the policies ever became effective." This contention is based upon two premises: (1) that under the terms of the contract the insured event consisted of the acts or omission of the insured giving rise to the claim rather than the making or presentation of the claim itself; and (2) that the acts and omission which gave rise to the instant claim were the making of material changes in the movie script without obtaining Genn's approval, all of which occurred before October 17, 1955.

Neither of these premises is tenable. The first runs counter to the trial court's interpretation of the contract—an interpretation which is amply supported by well settled rules of

construction. (See *Cal-Farm Ins. Co.* v. *Boisseranc*, 151 Cal. App.2d 775, 780 [312 P.2d 401].) The second is factually erroneous because it was *after* the effective date of the insurance that Genn declared his refusal to accept the role of "Browne" in the revised script and plaintiff refused to return to the original screen play. It was approximately two weeks *after* the effective date of the policy that plaintiff hired a substitute for Genn and proceeded with production dispensing with his services.

■ Applicable rules of construction were recently stated by this court in *City of Santa Monica* v. *Royal Indemnity Co.*, 157 Cal.App.2d 50, at pages 54 and 55 [320 P.2d 136], quoting from *Continental Casualty Co.* v. *Phoenix Construction Co.*, 46 Cal.2d 423, 437 [296 P.2d 801, 57 A.L.R.2d 914]; *Arenson* v. *National Automobile & Casualty Ins. Co.*, 45 Cal.2d 81, 83 [286 P.2d 816]; *Fageol T. & C. Co.* v. *Pacific Indemnity Co.*, 18 Cal.2d 731, 747 [117 P.2d 661], and *Osborne* v. *Security Ins. Co.*, 155 Cal.App.2d 201, 207-208 [318 P.2d 94]; ". . . any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. . . . ■ If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates. . . . ■ If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against, the amount of liability of the person or persons protected, the language will be understood in its most inclusive sense, for the benefit of the insured. . . . ■ Where two interpretations equally fair may be made, that which affords the greatest measure of protection to the assured will prevail."

■ With these rules of construction in mind, we readily conclude that the trial court's interpretation of the instant contract is correct. The coverage clause above quoted provides that the certificates cover ". . . loss . . . arising from any claim or claims which may be made . . . against the insured by reason of any negligent act, error or omission in connection with the production of Feature Length Motion Pictures . . . or breach of contract rights, . . . arising out of said Motion Pictures, wherever committed or alleged to have been committed by the Insured, . . ." It is reasonable to conclude that the quoted language expresses an intent to cover loss or liability arising from "any claim or claims which may be made" as distinguished from loss or liability arising

from the act or event upon which the claim may be based. This interpretation of the coverage clause is aided by the provisions of paragraph 7 which state that ". . . the Underwriters shall be liable only for loss arising from any claim or claims against the Insured during the effective period of this Insurance, or within three (3) years thereafter in respect of any Motion Picture covered hereunder, whether the production of any such Motion Picture shall have been commenced during said effective period or prior thereto. . . ." Again in paragraph 11 the term "any one loss" is defined to mean ". . . loss arising from any claim or claims made by any person or persons in respect of any act, error, or omissions, including any repetition or continuance thereof."

The trial court's interpretation of the contract is further aided by the provisions of paragraph 6 whereby the insured warranted that it knew of no act, error or omission ". . . which might form the basis of a claim against it or in respect of which a claim has already been made against it . . ." If it were the time of the act, error, or omission rather than the time of the assertion of the claim which was determinative of the insurer's liability, the warranty would be without purpose. If the policy were not intended to cover claims arising from acts or errors previously committed, there would have been no reason to call upon the insured to warrant its lack of knowledge of any such act, error, or omission.

 Appellants properly concede that a contract of insurance or of indemnity may be so written as to cover liability for events which have occurred prior to the issuance of the policy. There are numerous precedents for sustaining coverage in analogous situations. In *Tulare County Power Co.* v. *Pacific Surety Co.*, 43 Cal.App. 315, 325 [185 P. 399], the liability insurance policy purported to insure "against loss or expense arising or resulting from claims upon the assured for damages on account of bodily injuries, including death therefrom, accidentally suffered, or alleged to have been suffered, during the period of this policy . . . when such injuries or death result from accident occurring within the period hereinafter mentioned." A person was killed when he came in contact with an electric line which the insured had negligently installed and maintained. The insurer contended there was no liability for the claim because the negligent acts which caused the injury had been done prior to the issuance of the policy. In rejecting this contention the reviewing court declared: "The accident in question happened 'during the

period of this policy,' and we think it entirely immaterial that the installation of the wires which caused the accident occurred two months prior to the issuance of the policy. . . . its [the insurance company's] liability was for accidents occurring during the life of the policy.''

Similar contentions by the insurers were rejected in *Protex-A-Kar Co.* v. *Hartford Accident & Indemnity Co.*, 102 Cal. App.2d 408, 416 [227 P.2d 509], and *Remmer* v. *Glens Falls Indemnity Co.*, 140 Cal.App.2d 84, 88 [295 P.2d 19, 57 A.L.R. 2d 1379].

█ It appears equally clear that Endorsement Number 2 does not exclude coverage of the claim here involved. Under this Endorsement the insurers are liable for any loss occasioned by any claim arising either (a) on a picture placed in production during the term of the insurance, or (b) on a picture released or first licensed for use during the term of the insurance. It is undisputed that the picture was released for distribution in July, 1956, which was within the one year designated ''as the effective period'' of the certificates. The trial court also found that the picture was ''placed in production during the term and effective period of the certificates.'' There is ample evidence to sustain this finding.

█ Furthermore, it is to be noted that one of the pretrial stipulations provided as follows: ''On or about November 1, 1955, and while the aforesaid certificates were in full force and effect, . . . [Genn Company] asserted a claim against plaintiff arising out of and in connection with the production of said motion picture.'' This stipulation is binding upon the insurers and precludes any successful attack upon the court's finding that Genn's claim was a loss sustained in connection with the production of the picture. (*Capital Nat. Bank* v. *Smith*, 62 Cal.App.2d 328, 343 [144 P.2d 665]; *Grand* v. *Griesinger*, 160 Cal.App.2d 397, 408 [325 P.2d 475].)

█ Appellant's second contention, that plaintiff breached its warranty under paragraph 6 of the policy, must be rejected. The warranty was simply to the effect that the insured *knew* of no act, error or omission which might form the basis of a claim against it. The trial court's finding that plaintiff had no knowledge of the Genn claim on the effective date of the insurance is amply supported by the evidence. Both Mr. Tatelman and Mr. Nichols testified that the script as revised was not substantially different from the original script and both testified that they did not anticipate any objection from

Genn by reason of the changes made. ". . . where the insured qualifies his statement regarding a certain material matter by an expression to the effect that he makes such statement only according to his knowledge of the fact or condition involved, untruth or incompleteness of the statement due to ignorance, by the insured, of a fact or facts making the statement untrue or incomplete does not amount to a breach of warranty." (27 Cal.Jur.2d, 725, § 239.)

 There is evidence in the record that in accordance with industry custom and usage Mr. Tatelman believed he had the right to make or obtain script changes which he believed would improve the story. Under such circumstances there would not be any duty on the part of the insured to notify the insurer of a decision to revise the screenplay prior to any knowledge of the actor's objections to the revisions.

Third, appellant contends that the Genn claim arose by reason of a "wilful" act of the insured, and that the appellant was thereby exonerated by virtue of Insurance Code, section 533, which provides: "An insurer is not liable for loss caused by the wilful act of the insured . . ." As has been pointed out above, the trial court expressly refrained from deciding whether or not the insured actually had breached its contract with Genn, but it did find that ". . . if there were such a breach, it was not an intentional or wilful or deliberate breach by plaintiff, but was a breach which resulted in the ordinary course of business from negligent act, error and lack of due care on the part of plaintiff and its employees."

In urging the applicability of section 533 of the Insurance Code, appellant argues that the term "wilful act" as used in the statute means simply an act performed intentionally and deliberately, regardless of the intent or purpose with which it was performed. Respondent's position is that the term "wilful" as used in the statute denotes performance of an act for which no reasonable excuse can be given.

Both constructions advanced above find support in the decisions. Depending on the context, the terms "wilful" and "wilful act" as used in statutes have quite different significations attached to them. (See e.g. 45 Words & Phrases, 186, 246.) The terms are used in one sense to denote the *quality* of an act or the *intent* with which it was done. (See *McPheeters* v. *Board of Medical Examiners,* 103 Cal.App. 297, 301 [284 P. 938] ; *Alden* v. *Mayfield,* 33 Cal.App. 724, 727 [166 P. 382].) More often the terms denote simply an act delib-

erately and voluntarily performed. (See *Davis* v. *Morris*, 37 Cal.App.2d 269, 274 [99 P.2d 345] ; *In re Trombley*, 31 Cal.2d 801, 807 [193 P.2d 734] (construction of the term "wilful" in sections 203 and 216 of the Labor Code.) (*Parsons* v. *Smilie*, 97 Cal. 647, 654-656 [32 P. 702] ; *Crowell* v. *City of Riverside*, 26 Cal.App.2d 566, 581 [80 P.2d 120] (construction of "wilful" in Civ. Code, § 3275).)

But the fact that a word is common to two statutes does not mean that a decision construing it in one statute must control in the construction of the other. (*Union Iron Works* v. *Industrial Acc. Com.*, 190 Cal. 33, 43 [210 P. 410].) Thus we must determine the sense in which the Legislature employed the term "wilful act" in enacting section 533 of the Insurance Code. (See generally, 23 Cal.Jur. 745, § 122 et seq.) In *McKenzie* v. *Scottish U. & N. Ins. Co.*, 112 Cal. 548, 557-558 [44 P. 922], the Supreme Court in discussing the legislative intent in the enactment of section 2629 of the Civil Code, the statutory predecessor of Insurance Code section 533, said : "The *ordinary* negligence of the insured and his agents has long been held as a part of the risk which the insurer takes upon himself, and the existence of which, where it is the proximate cause of the loss, does not absolve the insurer from liability. But *wilful exposure—gross negligence—negligence amounting to misconduct, etc., have often been held to release the insurer from such liability.*

"To set at rest questions involving the different degrees of negligence, and the results following therefrom, we may reasonably suppose was the object of the framers of our Civil Code.

"Under section 2629 of the Civil Code [now Ins. Code, § 533] *the nice distinctions often made necessary are dispensed with,* and the general proposition is established that *no form of negligence. on the part of the insured,* or his agents or others, leading to a loss avoids the policy, unless it amounts to a *willful* act on the part of the insured. The code thereby sets at rest a fruitful cause of litigation." (Emphasis added.)

A "wilful act" as used in this statute connotes something more blameworthy than the sort of misconduct involved in ordinary negligence, and something more than the mere intentional doing of an act constituting such negligence. (*Cf. Meek* v. *Fowler*, 3 Cal.2d 420, 426 [45 P.2d 194] ; *Gimenez* v. *Rissen*, 12 Cal.App.2d 152, 161 [55 P.2d 292, 56 P.2d 299].)

The finding that the breach, if one occurred, was not "wilful" is supported by substantial evidence. (*Cf.*

*Pellas* v. *Ocean Acc. & Guar. Corp.*, 24 Cal.App.2d 528, 535 [75 P.2d 635].) Mr. Tatelman testified in substance that he made arrangements for filming from the revised screenplay on the assumption that Mr. Genn would play his role in the revised version without objection. It is a legitimate inference that when Mr. Genn's objections were made known, it was too late to do anything but proceed to produce the film on the revised version. (See *McPheeters* v. *Board of Medical Examiners*, 103 Cal.App. 297, 301 [284 P. 938]; and see also *Nome Beach Lighterage & Transportation Co.* v. *Munich Assur.*, 123 F. 820, 825-826, *rev'd.* 133 F. 636 [67 C.C.A. 602, 1 L.R.A.N.S. 1095], on retrial, judgment for the insured *aff'd.* 167 F. 119, 120.)

■ The fourth of appellants' major contentions is that the policy covers only a loss arising from a "negligent act, error or omission" on the part of the insured, and that liability for a loss arising from a "breach of contract" must be limited to a negligent breach. In other words, the argument is that the element of negligence must be present to qualify the breach of contract as an insured risk. The argument is academic in view of the trial court's express finding that the claimed breach of contract rights ". . . arose by reason of negligent act, error or omission on the part of plaintiff in connection with the production of said motion picture." Although the finding does not recite the specific act or omission constituting the negligence, it was not unreasonable for the trial court to conclude that Mr. Tatelman had been negligent in failing to notify Mr. Genn at an earlier date of the proposed changes in his role and in failing to seek his cooperation and acquiescence in changes before proceeding with other arrangements.

Finally, appellant contends that the trial court committed reversible error in failing to find whether or not there was an actual breach of contract by respondent, arguing that the validity of the Genn claim constituted a vital issue because "[i]f there was no breach [by the plaintiff] there was no loss for which defendant could possibly be liable." This argument, in effect, is simply another attack on the trial court's conclusion that "The certificates issued by defendants indemnify plaintiff against loss resulting from breach of contract rights either committed or *alleged to have been committed by plaintiff.*" (Emphasis added.) That construction of the contract

is well supported by precedent and authority, as discussed *supra.*

By the terms of the instant contract the insurer was not obligated to defend the insured against asserted claims. But when the insurer denied coverage and disclaimed liability, the insured acquired the right to make any reasonable and bona fide compromise of the claim against it. (*Ritchie* v. *Anchor Casualty Co.,* 135 Cal.App.2d 245, 258 [286 P.2d 1000]; *Lamb* v. *Belt Casualty Co.,* 3 Cal.App.2d 624, 630 [40 P.2d 311].) The insurer by the terms of its contract did not agree to indemnify against liability, but rather against 90 per cent of the loss arising from the *making of a claim* alleging negligent act, error or omission or breach of contract rights.

"A policy providing for indemnity against the *liability* is to be differentiated from a policy providing for indemnity against *loss or damage."* (1 Richards, Insurance, 612-614, § 166.) (Emphasis added.) The settlement by plaintiff with Mr. Genn was presumptive evidence of liability of the insured. (*Ritchie* v. *Anchor Casualty Co., supra,* 135 Cal. App.2d 245, 250; *Chrysler Motors* v. *Royal Indemnity Co.,* 76 Cal.App.2d 785, 788 [174 P.2d 318].) However, wholly apart from that presumption there is ample evidence to sustain the trial court's finding that the settlement of the instant claim was reasonable and prudent in the circumstances. It was not necessary for the trial court to find that plaintiff had in fact breached its contract with Genn in order to find a loss for which the appellant was liable.

The judgment is affirmed.

Fox, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied November 6, 1958, and appellants' petition for a hearing by the Supreme Court was denied December 3, 1958.